## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **TIMOTHY L. BROWNING,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:15cv00008 |
| | ) | **MEMORANDUM  OPINION** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | By:   PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Timothy L. Browning, ("Browning"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a

particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

By decision dated April 24, 1990, an ALJ found that Browning was entitled to disabled child's insurance benefits and SSI based on an anxiety disorder with panic attacks and cognitive slowing.[1] (R. at 238-42.) However, the record shows that in 2000 Browning began working and continued to work at or above substantial gainful activity levels through 2011. (R. at 265-66.)

The record shows that Browning protectively filed his applications for DIB and SSI on November 8, 2011, alleging disability as of May 13, 2011, due to back problems; severe head pain; anxiety; panic attacks; blackouts; dizziness; and thyroid problems. (Record, ("R."), at 252-62, 279, 292.) The claims were denied initially and upon reconsideration. (R. at 149-51, 154-56, 162, 167-69, 171-76, 178-80.) Browning then requested a hearing before an administrative law judge, ("ALJ"). (R. at 181.) The ALJ held a hearing on November 15, 2013, at which Browning was represented by counsel. (R. at 61-101.)

By decision dated January 31, 2014, the ALJ denied Browning's claims. (R. at 12-27.) The ALJ found that Browning met the nondisability insured status

---

[1] The ALJ in the current case found that the 1990 decision was irrelevant to Browning's current claim for disability. (R. at 12.) However, the ALJ noted for the record that, at about age 20, Browning received disability for anxiety-related disorders. (R. at 12.)

requirements of the Act for DIB purposes through December 31, 2016.[2] (R. at 15.) The ALJ found that Browning had not engaged in substantial gainful activity since May 13, 2011, the alleged onset date. (R. at 15.) The ALJ found that the medical evidence established that Browning had severe impairments, namely a history of chronic ear infections with right-sided hearing loss; obesity; obstructive sleep apnea; lumbar degenerative changes; back and leg pain; and affective and anxiety disorders, but she found that Browning did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 15.) The ALJ found that Browning had the residual functional capacity to perform simple, unskilled, repetitive light work[3] that did not require more than occasional balancing, kneeling, crouching, stooping, crawling, climbing of ramps and stairs and occasional interaction with co-workers and supervisors, that did not require concentrated exposure to climbing ladders, ropes and scaffolds, working on vibrating surfaces, working around hazardous machinery, unprotected heights and loud background noises; and that did not require interaction with the general public. (R. at 23.) The ALJ found that Browning was unable to perform his past relevant work. (R. at 25.) Based on Browning's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Browning could perform, including jobs as an assembler, a night cleaner and a routing clerk. (R. at 26-27.) Thus, the ALJ concluded that Browning was not under a disability as defined by the Act and was

---

[2] Therefore, Browning must show that he was disabled between May 13, 2011, the alleged onset date, and January 31, 2014, the date of the ALJ's decision, in order to be eligible for DIB benefits.

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R.. §§ 406.1567(b), 416.967(b) (2015).

not eligible for DIB or SSI benefits. (R. at 27.) *See* 20 C.F.R. §§ 404.1520(g) 416.920(g) (2015).

After the ALJ issued her decision, Browning pursued his administrative appeals, (R. at 7), but the Appeals Council denied his request for review. (R. at 1-6.) Browning then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2015). This case is before this court on Browning's motion for summary judgment filed December 25, 2015, and the Commissioner's motion for summary judgment filed January 28, 2016.

## II. Facts

Browning was born in 1969, (R. at 66, 252, 256), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(d), 416.963(d). Browning obtained his general equivalency development, ("GED"), diploma and has vocational training in bricklaying. (R. at 64, 66, 280.) He has past work experience as a truck driver and as a laborer. (R. at 64-68, 280.) Browning stated that, when he was evaluated by Elizabeth Jones, he was having a bad day.[4] (R. at 72.) He also stated that, during the evaluation, he was anxious and confused and that his back was "bothering" him. (R. at 72.) He stated that he tried his best to do what he thought was right during the evaluation with Jones. (R. at 88-89.) Browning stated that he had blackout spells once a day or "maybe twice every three days." (R. at 73.)

---

[4] Elizabeth A. Jones, M.A., a licensed senior psychological examiner, and Diane L. Whitehead, Ph.D., a licensed clinical psychologist, evaluated Browning in October 2013 and found that he was uncooperative, did not appear to put forth effort and appeared to lack motivation and persistence during testing. (R. at 661, 664.)

-4-

Asheley Wells, a vocational expert, also was present and testified at Browning's hearing. (R. at 94-99.) Wells classified Browning's work as a coal hauler as medium[5] and unskilled, as a pallet builder as medium and semi-skilled and as a warehouse worker or laborer as medium and unskilled. (R. at 95-96.) Wells was asked to consider a hypothetical individual of Browning's age, education and work history, who would be limited to simple, unskilled, repetitive light work that did not require more than occasional climbing of ramps and stairs, balancing, kneeling, crawling, stooping and crouching; that did not require work around concentrated exposure to hazardous machinery, unprotected heights, vibrating surfaces, or climbing ladders, ropes and scaffolds; that did not require work around excessively loud background noise; that did not involve interactions with the general public; and that did not require more than occasional interaction with co-workers and supervisors. (R. at 96.) Wells stated that such an individual could not perform any of Browning's past work. (R. at 96-97.) Wells stated that the individual could perform other jobs existing in significant numbers in the national economy, including those of an assembler, a night cleaner and a routing clerk. (R. at 97.) Wells was asked to consider the same individual, but who would be limited to standing and walking two to four hours in an eight-hour workday. (R. at 97.) She stated that there would be jobs available at the sedentary[6] level that such an

---

[5] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2015).

[6] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2015).

Case 2:15-cv-00008-PMS   Document 15   Filed 09/19/16   Page 5 of 29   Pageid#: 784

individual could perform, including jobs as an assembler, a cuff folder and a weight tester. (R. at 97-98.)

In rendering her decision, the ALJ reviewed records from Wise County Public Schools; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Robert McGuffin, M.D., a state agency physician; Joseph Leizer, Ph.D., a state agency psychologist; Dr. Shirish Shahane, M.D., a state agency physician; Dr. German Lizarralde, M.D., an endocrinologist; Wellmont Mountain View Regional Medical Center; Norton Community Hospital; Dr. David S. Haynes, M.D.; Dr. James Bekeny, M.D.; Dr. R. Scott Macdonald, M.D.; Elizabeth A. Jones, M.A., a licensed senior psychological examiner; Diane L. Whitehead, Ph.D., a licensed clinical psychologist; Dr. Yemaya B. Gilliam, M.D.; Dr. Uzma Ehtesham, M.D.; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Dr. Saeed Jadali, M.D.; Dr. G. S. Kanwal, M.D.; Dr. Amor A. Barongan, M.D.; St. Thomas Hospital; Crystal Burke, L.C.S.W., a licensed clinical social worker; and Christy R. Swinney, N.P., a nurse practitioner.

In April 2006, an MRI of Browning's lumbar spine showed a broad-based right paracentral disc protrusion at the L5-S1 level with mild effacement of the ventral thecal sac with possible mild mass effect on the right S1 nerve root. (R. at 652.) On October 29, 2007, x-rays of Browning's lumbar spine revealed mild degenerative changes. (R. at 651.) Another MRI of the lumbar spine, dated November 7, 2007, showed marked desiccation and broad-based bulging at the L4-L5 and L5-S1 levels; mild broad-based disc bulging and mild facet degenerative changes at the L1-L4 levels; a broad-based disc bulge, inferior annular tear in the midline posteriorly, mild to moderate facet degenerative changes, ligamentum thickening and mild central spinal canal stenosis at the L4-L5 level; and chronic

central posterior herniation and distortion of the ventral thecal sac at the L5-S1 level. (R. at 649-50.)

On June 10, 2010, Dr. German Lizarralde, M.D., an endocrinologist, examined Browning. (R. at 341-42.) Dr. Lizarralde assessed Browning with multinodular goiter; tobacco abuse; hypertension, under reasonable control; and history of weight loss. (R. at 342.) Dr. Lizarralde noted that Browning's abnormal thyroid test results may have been due to subacute thyroiditis. (R. at 342.) Therapy with a low dose of Tapazole resulted in prompt correction of Browning's thyroid abnormality. (R. at 342.) An ultrasound of Browning's thyroid performed in January 2010 showed enlarged right and left lobes of the thyroid; a small cluster of calcification in the posterior aspect of the upper pole of the right lobe; and a small benign cyst in the lower pole of the left lobe. (R. at 342, 347.) A biopsy of the upper right lobe calcification was performed on June 15, 2010, and showed a non-neoplastic goiter. (R. at 345.)

Browning has a history of chronic right ear infections and hearing loss. (R. at 421.) On August 20, 2010, Browning underwent a bilateral inner ear CT scan, which showed evidence of erosion of the scutum and ossicles; minimal fluid in the left middle ear cavity; and bilateral mastoid air cell opacifications. (R. at 352-53, 385-87.) On September 23, 2010, Browning saw Dr. David S. Haynes, M.D., for evaluation and treatment of chronic ear disease. (R. at 421-22.) Dr. Haynes reported that, with the exception of Browning's otologic examination, he had a normal examination. (R. at 422.) Dr. Haynes diagnosed bilateral chronic otitis media with right-sided cholesteatoma and left serous effusion, for which surgery was recommended. (R. at 422.) On December 23, 2010, Dr. Haynes saw Browning following a right tympanomastoidectomy with ossicular chain reconstruction. (R.

at 420.) He noted that Browning's tympanic membrane was intact and healing, and there was no evidence of recurrent disease or perforation. (R. at 420.) Browning reported a marked improvement in his pain. (R. at 420.) On April 14, 2011, Browning's hearing test results showed mild to moderate severe mixed loss in the left ear and moderate to moderately severe mixed loss on the right. (R. at 424). His word recognition scores were excellent bilaterally. (R. at 424.) Dr. Haynes saw Browning for a surgical follow-up on April 14, 2011, at which time he was doing very well. (R. at 419.)

The record shows that Dr. G. S. Kanwal, M.D., treated Browning from April 2, 2013, through October 31, 2013. (R. at 590-96, 655-59, 704.) During this time, Dr. Kanwal diagnosed chronic low back pain, disc disease, radiculopathy and chronic obstructive pulmonary disease, ("COPD"). (R. at 590-96, 655-59,704.) Dr. Kanwal noted that Browning exhibited no anxiety or depression. (R. at 590-96, 655-59,704.)

On May 16, 2011, Browning presented to the emergency room at Wellmont Mountain View Regional Medical Center, ("Mountain View"), for treatment of a headache with nausea. (R. at 389-94.) A CT scan of Browning's brain showed a small parietal arachnoid cyst and no acute intracranial abnormality. (R. at 392-94.) Browning appeared well and had a normal mood and affect. (R. at 391.) His neurologic, extremity, sensory/motor, abdominal, respiratory, cardiovascular and head and neck examinations were normal. (R. at 391.) Browning was diagnosed with a migraine, treated and discharged in improved condition. (R. at 391.)

On May 17, 2011, Browning presented to the emergency room at Norton Community Hospital for treatment of a headache. (R. at 433-35.) It was noted that

-8-

Browning appeared anxious. (R. at 433.) His neurologic, extremity, sensory/motor, abdominal, respiratory, cardiovascular and head and neck examinations were normal. (R. at 434.) He was diagnosed with a migraine headache and maxillary sinusitis. (R. at 434.) A CT scan of Browning's brain showed a possible epidermoid cyst or arachnoid cyst; extensive changes of sinusitis; abnormal tissue in the nasal passage on the left side with findings suggestive of destruction of the middle and inferior nasal turbinates; and changes of mastoiditis with osseous destruction of the right mastoid. (R. at 438-39.)

On May 25, 2011, Browning was admitted to Mountain View for complaints of severe left-sided facial pain. (R. at 354-83.) Browning underwent a nasal endoscopy, an endoscopic maxillary antrostomy and removal of the necrotic tissue. (R. at 360.) He was discharged on May 27, 2011, with diagnoses of right chronic maxillary sinusitis, left chronic ethmoid sinusitis and fungal sinusitis. (R. at 354.)

On July 11, 2011, Browning saw Dr. James Bekeny, M.D., for left-sided head and facial pain. (R. at 417-18.) Dr. Bekeny reported that Browning was alert, oriented and in no acute distress. (R. at 418.) A maxillofacial CT scan revealed findings consistent with bilateral maxillary sinusitis, acute sinusitis and suspected underlying polyps or cysts. (R. at 401-02.) Dr. Bekeny diagnosed possible allergic rhinitis. (R. at 418.)

On July 20, 2011, Dr. R. Scott Macdonald, M.D., saw Browning for a neurological consultation for evaluation of his complaints of daily headaches. (R. at 450-51.) Browning reported that he smoked one pack of cigarettes per day. (R. at 450.) Dr. Macdonald reported that Browning's memory was intact for past and recent details; his fund of information was normal; and his affect was appropriate.

(R. at 450.) Browning appeared to be in pain as Dr. Macdonald observed a tear from both eyes during evaluation. (R. at 450.) He had frequent sniffing movements and occasionally some twitching around his eyes due to muscle activity. (R. at 450.) Dr. Macdonald diagnosed left hemicrania. (R. at 451.) On August 1, 2011, an angiogram of Browning's head was normal. (R. at 474.) On August 22, 2011, Dr. Macdonald conducted a carotid duplex examination, which showed a small amount of plaque in the right carotid bulb; no evidence of bilateral carotid artery stenosis was noted; bilateral vertebral flow was antegrade; and there was a cystic area lateral to the right carotid. (R. at 447.) On October 31, 2011, Browning reported to Dr. Macdonald a history of left-sided headaches with interval improvement. (R. at 446.) Browning related his problems to "nerves." (R. at 446.) Dr. Macdonald's examination revealed chronic mild left ptosis; symmetric pupils; intact eye movements; symmetric facial movement; tongue protruded in midline; full peripheral motor strength; and normal gait. (R. at 446.)

On August 22, 2011, Browning saw Dr. Yemaya B. Gilliam, M.D., for complaints of chronic back pain and weakness. (R. at 491-94.) Browning rated his pain level at a seven on a scale of one to 10. (R. at 491.) Physical examination was normal with the exception of positive straight leg raising tests and tenderness to palpation. (R. at 493.) Dr. Gilliam diagnosed lumbar radiculopathy. (R. at 492.) On September 6, 2011, and October 4, 2011, Browning complained of chronic back pain. (R. at 481-84.) Physical examination was normal with the exception of positive straight leg raising tests. (R. at 483, 488.) Dr. Gilliam reported that Browning's affect was within normal limits. (R. at 483, 488.) On November 1, 2011, Browning saw Dr. Gilliam for complaints of chronic back pain and anxiety. (R. at 476-79.) Browning rated his pain level at a four to five on a scale of one to 10. (R. at 476.) Physical examination was normal with the exception of positive

-10-

straight leg raising tests. (R. at 478.) Dr. Gilliam diagnosed lumbar disc disease. (R. at 477.) On November 30, 2011, Browning complained of low back pain and described his average pain level as a three on a scale of one to 10. (R. at 581.) His physical examination was normal with the exception of positive straight leg raising tests and tenderness with limited range of motion in the lower extremities. (R. at 582-83.) His mood and affect were described as depressed and stable, but he was not angry or anxious. (R. at 582.)

Throughout 2012, Browning continued to report a pain level, with medication, of three on a scale of one to 10, and it was noted that he had good compliance with treatment, which resulted in good to fair symptom control. (R. at 546, 550-51, 553-54, 556, 559, 563, 566, 569, 572, 575, 578.) His physical examinations were normal with the exception of positive straight leg raising tests and tenderness with limited range of motion in the lower extremities. (R. at 547-48, 551-52, 554-55, 557-58, 560-61, 564-65, 570-71, 576-77, 579-80.) His mood and affect were described as stable, and he was not angry, anxious or depressed. (R. at 548, 552, 554, 561, 564, 570, 577.) A sleep study was performed on January 24, 2012, which showed obstructive sleep apnea. (R. at 509-10.) Weight loss and avoidance of sedatives and stimulants were recommended. (R. at 510.) In April 2012, Dr. Gilliam found no impairment in Browning's recent or remote memory; he had normal attention span and ability to concentrate; and appropriate fund of knowledge. (R. at 567.)

On December 17, 2012, Dr. Gilliam completed a physical assessment, indicating that Browning occasionally could lift and carry items weighing up to 20 pounds and frequently lift and carry items weighing up to 10 pounds. (R. at 672-74.) Dr. Gilliam found that Browning could stand and/or walk a total of one to two

hours in an eight-hour workday. (R. at 672.) Dr. Gilliam found that Browning could sit a total of three to four hours in an eight-hour workday. (R. at 673.) Dr. Gilliam found that Browning could occasionally kneel and never climb, stoop, balance, crouch or crawl. (R. at 673.) Dr. Gilliam found that Browning was limited in his ability to feel, push and pull. (R. at 673.) Dr. Gilliam opined that Browning was restricted from working around heights, moving machinery and temperature extremes. (R. at 674.) Dr. Gilliam reported that Browning would be absent from work more than two days a month. (R. at 674.)

On February 12, 2013, Browning complained of neck and low back pain and described his pain level as a seven on a scale of one to 10. (R. at 542-44.) His physical examination was normal with the exception of positive straight leg raising tests and tenderness with limited range of motion in the lower extremities. (R. at 543-44.) His mood and affect were described as stable, and he was not angry, anxious or depressed. (R. at 544.)

On November 23, 2011, Browning saw Dr. Uzma Ehtesham, M.D., a psychiatrist, for a diagnostic evaluation. (R. at 503-08.) Browning reported no symptoms of mania, impulse control, delusions, hallucinations or symptoms of PTSD. (R. at 503.) Dr. Ehtesham noted that Browning maintained eye contact; he had regular rate and rhythm of speech; he had normal motor activity; his affect was anxious and blunted; his thought process was goal-oriented; he had good insight; and intact judgment. (R. at 506.) Dr. Ehtesham diagnosed generalized anxiety disorder, depression and hypertension. (R. at 508.) She assessed Browning's then-current Global Assessment of Functioning, ("GAF"),[7] score at 58.[8] (R. at 508.) On

---

[7] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC

December 7, 2011, Browning returned to Dr. Ehtesham with complaints of anxiety and panic attacks. (R. at 501-02.) He rated his anxiety at an eight on a scale of one to 10 and his depression at a three on a scale of one to 10. (R. at 501.) Browning denied delusions, hallucinations, post-traumatic stress disorder, ("PTSD"), symptoms and attention symptoms. (R. at 501.) Dr. Ehtesham reported that Browning's gait was normal; he had intermittent eye contact; his speech was spontaneous; his affect was anxious; his mood was congruent; he had fair insight; his judgment was deemed intact and improved; and his reality testing was noted as improved. (R. at 501.)

On February 26, 2013, Dr. Ehtesham reported that Browning had an anxious affect and congruent mood. (R. at 685.) Browning denied suicidal ideations, delusions and mania. (R. at 685.) His thought process was described as indecisive; he had improved insight and intact judgment; and reality testing was intact. (R. at 685.) He was diagnosed with major depressive disorder, recurrent, and assessed a then-current GAF score at 61-70.[9] (R. at 686.) On March 21, 2013, Dr. Ehtesham noted that Browning's then-current level of functioning was "good." (R. at 682.) On April 16, 2013, Browning rated his level of depression at a three on a scale of one to 10 and his level of anxiety at a two on a scale of one to 10. (R. at 677.) He denied panic, but reported visual hallucinations. (R. at 677-78.) Dr. Ehtesham reported that Browning's affect was anxious; his mood was congruent; he had

AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[8] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

[9] A GAF score of 61-70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well ...." DSM-IV at 32.

improved insight; and goal-oriented thought process. (R. at 678.) His then-current GAF score was assessed at 51 to 60. (R. at 677.)

On May 10, 2013, Dr. Ehtesham completed a mental assessment, indicating that Browning had a seriously limited ability to follow work rules; to use judgment; to interact with supervisors; to function independently; to understand, remember and carry out simple job instructions; to maintain personal appearance; and to relate predictably in social situations. (R. at 688-90.) She found that Browning had no useful ability to relate to co-workers; to deal with the public; to deal with work stresses; to maintain attention and concentration; to understand, remember and carry out complex and detailed job instructions; to behave in an emotionally stable manner; and to demonstrate reliability. (R. at 688-89.) She reported that Browning would be absent from work more than two days a month. (R. at 690.)

On March 26, 2012, Christy R. Swinney, N.P., a nurse practitioner with Southwest Virginia Outpatient Center, saw Browning for complaints of chronic low back pain. (R. at 514-15.) Browning rated his average pain level, with medication, at a two on a scale of one to 10. (R. at 514.) He was alert and oriented with no impairment of recent or remote memory; he had normal attention span and ability to concentrate; he was able to name objects and repeat phrases; and his fund of knowledge was appropriate. (R. at 515.) Browning's examination was normal with the exception of a 2+ bilateral radial pulse. (R. at 515.)

On March 29, 2012, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Browning was mildly restricted in his activities of daily living, had mild

difficulties in maintaining social functioning and had no difficulties in maintaining concentration, persistence or pace. (R. at 108-09.) He found that Browning had experienced no repeated episodes of decompensation of extended duration. (R. at 108.)

Also on March 29, 2012, Dr. Robert McGuffin, M.D., a state agency physician, opined that Browning had the residual functional capacity to perform light work. (R. at 109-10.) No postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 110.)

On July 23, 2012, Browning reported to Crystal Burke, L.C.S.W., a licensed clinical social worker, that he had fairly good pain control and that Klonopin was helping his anxiety symptoms. (R. at 541.) His mood appeared to be mildly depressed but he had appropriate hygiene and grooming. (R. at 541.) On September 19, 2012, Browning reported that his medication was helping control his anxiety symptoms. (R. at 540.) His affect was described as anxious. (R. at 540.) Browning appeared to have adequate self-care. (R. at 540.) Burke diagnosed an anxiety disorder, not otherwise specified, and depressive disorder, not otherwise specified. (R. at 540.) On January 14, 2013, Browning complained of severe anxiety. (R. at 539.) He reported experiencing four to five panic attacks a day and that he was unable to complete his activities of daily living. (R. at 539.) Browning stated that he had been prescribed Klonopin and that it helped "some." (R. at 539.) His hygiene and grooming was reported as good. (R. at 539.) Burke diagnosed depressive disorder, not elsewhere classified, and anxiety. (R. at 539.)

On August 21, 2012, Joseph Leizer, Ph.D., a state agency psychologist, completed a PRTF, indicating that Browning was mildly restricted in his activities

of daily living, had mild difficulties in maintaining social functioning and had mild difficulties in maintaining concentration, persistence or pace. (R. at 130-31.) He found that Browning had experienced no repeated episodes of decompensation of extended duration. (R. at 131.)

Also on August 21, 2012, Dr. Shirish Shahane, M.D., a state agency physician, opined that Browning had the residual functional capacity to perform light work that did not require him to work around concentrated exposure to noises or vibration. (R. at 132-33.) No postural, manipulative, visual or communicative limitations were noted. (R. at 132.)

On December 4, 2012, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Browning at the request of Browning's attorney. (R. at 529-38.) Browning reported an average daily pain at a level of five to six on a subjective 10-point scale. (R. at 531.) He reported that he was not receiving any mental health treatment. (R. at 532.) Browning placed his then-current depression at a level of eight on a scale of one to 10. (R. at 533.) Lanthorn reported that Browning was virtually consumed with pain and "nervous problems." (R. at 534.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Browning obtained a full-scale IQ score of 59. (R. at 534-35.) He earned a working memory index of 69, which placed him in the extremely low range for working memory abilities. (R. at 535.) Lanthorn reported that he believed the test results were valid and accurately reflected Browning's degree of intellectual functioning. (R. at 534.) Lanthorn diagnosed panic disorder without agoraphobia; major depressive disorder, recurrent, severe; chronic pain disorder associated with both psychological factors and general medical conditions; and mild mental retardation. (R. at 536.) He assessed Browning's then-current GAF

score at 45 to 50.[10] (R. at 536.) Lanthorn found that Browning was competent to manage his own funds. (R. at 537.)

Lanthorn completed a mental assessment, indicating that Browning had a limited, but satisfactory, ability to understand, remember and carry out simple job instructions. (R. at 526-28.) He opined that Browning had a seriously limited ability to function independently; to maintain attention and concentration; to understand, remember and carry out detailed instructions; and to maintain personal appearance. (R. at 526-27.) Lanthorn found that Browning had no useful ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to understand, remember and carry out complex job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 526-27.) Lanthorn also reported that Browning would be expected to be absent from work more than two days a month as a result of his impairments. (R. at 528.)

On March 21, 2013, Browning saw Dr. Amor A. Barongan, M.D., for complaints of low back pain. (R. at 585-88.) He reported that his average daily pain rated a two on a scale of one to 10. (R. at 585.) Examination showed tenderness in his lumbosacral spine and bilateral knees. (R. at 587.) His mood and affect were anxious. (R. at 587.) Dr. Barongan diagnosed varicose veins; hyperthyroidism; hypertension; bone/cartilage disorder; and low back pain. (R. at 588.) Dr. Barongan advised Browning to use over-the-counter Salonpas, Aleve and extra-strength Tylenol for his pain. (R. at 588.)

_____

[10] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." DSM-IV at 32.

On May 16, 2013, Dr. Kanwal completed a physical assessment, indicating that Browning could occasionally lift and carry items weighing up to five pounds. (R. at 597-99.) He found that Browning was unable to frequently lift and carry items of any weight. (R. at 597.) He found that Browning could stand and/or walk a total of two to four hours in an eight-hour workday and that he could do so for up to 30 to 60 minutes without interruption. (R. at 597.) Dr. Kanwal found that Browning could sit four to five hours in an eight-hour workday and that he could do so for up to one hour without interruption. (R. at 598.) He found that Browning could never climb, stoop, kneel, balance, crouch or crawl and that he had limited ability to reach, push and pull. (R. at 598.) Dr. Kanwal reported that Browning was restricted from working around heights, moving machinery and noise. (R. at 599.) He opined that Browning would be expected to be absent from work more than two days a month. (R. at 599.)

That same day, Dr. Kanwal completed a mental assessment, indicating that Browning had a seriously limited ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to understand, remember and carry out simple job instructions; to maintain personal appearance; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 600-02.) He found that Browning had no useful ability to function independently; to maintain attention and concentration; to understand, remember and carry out complex and detailed instructions; and to demonstrate reliability. (R. at 600-01.) He opined that Browning would be expected to be absent from work more than two days a month. (R. at 602.)

On October 18, 2013, Elizabeth A. Jones, M.A., a licensed senior psychological examiner, and Diane L. Whitehead, Ph.D., a licensed clinical psychologist, evaluated Browning at the request of Disability Determination Services. (R. at 661-66.) Browning had a moderately blunted affect and congruent mood and displayed psychomotor agitation, as his hands shook on occasion. (R. at 661.) Jones and Whitehead noted that Browning was not cooperative during the measure of intelligence testing, as he did not appear to put forth effort and appeared to attempt to present himself more lower-functioning that he likely was based on his quality of verbalization and mental status. (R. at 661, 664.) Browning also appeared to lack motivation and persistence. (R. at 661.) Jones and Whitehead deemed the test results invalid and, therefore, they were not reported. (R. at 661, 664.)

Browning reported that he was in special education classes and that he quit school at the age of 17. (R. at 662.) He reported that he had never attempted to obtain his GED. (R. at 663.) Jones and Whitehead diagnosed anxiety disorder, not otherwise specified, and assessed his then-current GAF score at 60, with 60 being the highest and lowest score within the past six months. (R. at 665.) They noted that Browning's ability to attend and concentrate may be impacted due to chronic pain. (R. at 665.) It was noted that Browning did not appear to be in pain at the time of the evaluation. (R. at 665.) Due to his lack of credibility in regards to his performance on the measure of intelligence, Jones and Whitehead questioned the severity of Browning's affect of distress and the impact that it may have on his ability to function on a daily basis. (R. at 665.)

Jones and Whitehead completed a mental assessment, indicating that Browning had a slight limitation in his ability to understand, remember and carry

out simple instructions; and to make judgments on simple work-related decisions. (R. at 667-69.) They found that Browning had a more than slight limitation in his ability to understand, remember and carry out complex instructions; to make judgments on complex work-related decisions; to interact appropriately with the public, supervisors and co-workers; and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 667-68.)

On October 18, 2013, Dr. Saeed Jadali, M.D., examined Browning at the request of Disability Determination Services. (R. at 692-97.) Browning reported that pain medication helped reduce the severity of his pain. (R. at 692-93.) Browning stated that his medication helped his anxiety symptoms, but that he continued to experience three to five anxiety attacks a day. (R. at 693.) Dr. Jadali reported that Browning did not need assistance on and off the examination table. (R. at 694.) He was not using a cane, crutches or a walker. (R. at 694.) Dr. Jadali reported that Browning was alert and oriented; he could hear and comprehend normal conversational speech; his speech was fluent and comprehendible; his mood and affect were normal; and his thought process was logical. (R. at 694.) Browning did not have paravertebral muscle spasms; he had no tenderness or kyphosis along the vertebral column; no swelling, deformity, tenderness, redness or crepitus in the joints; no instability to stress testing, erythema, warmth or effusion in his shoulder, elbow, wrist, knee or ankle; and anterior and posterior drawer tests were negative. (R. at 695-96.) Dr. Jadali diagnosed narcotic-dependent, chronic low back pain and mood disorder. (R. at 696.)

Dr. Jadali completed a medical assessment, indicating that Browning could continuously lift and carry items weighing up to 10 pounds; frequently lift and carry items weighing up to 20 pounds; and occasionally lift and carry items

weighing up to 50 pounds. (R. at 698-703.) He found that Browning could sit, stand and/or walk a total of six hours in an eight-hour workday and that he could do so for up to two hours without interruption. (R. at 699.) No limitations were noted on Browning's ability to reach; to handle; to finger; to feel; and to push and pull. (R. at 700.) Dr. Jadali noted that Browning could continuously operate foot controls; climb stairs, ramps, ladders and scaffolds; balance; stoop; kneel; crouch; and crawl. (R. at 700-01.) Dr. Jadali reported that Browning had decreased hearing in his right ear, but that he retained the ability to hear and understand simple oral instructions and to communicate simple information. (R. at 701.) He found that Browning could occasionally work around dust, odors, fumes and pulmonary irritants; extreme cold and heat; and vibrations. (R. at 702.) Dr. Jadali reported that Browning could not work around more than moderate exposure to noise. (R. at 702.) He also found that Browning could perform his activities of daily living. (R. at 703.)

### III.  Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2015). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2015).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion,

even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if she sufficiently explains her rationale and if the record supports her findings.

Browning argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 6-9.) Browning further argues that the ALJ erred by failing to issue subpoenas to have certain consultative evaluators present at his hearing for cross-examination. (Plaintiff's Brief at 5-6.)

The ALJ found that Browning had the residual functional capacity to perform simple, unskilled, repetitive light work that did not require more than occasional balancing, kneeling, crouching, stooping, crawling, climbing ramps and stairs and occasional interaction with co-workers and supervisors; that did not require concentrated exposure to climbing ladders, ropes and scaffolds, working on vibrating surfaces, working around hazardous machinery and unprotected heights; and that did not require working around loud background noises or interaction with the general public. (R. at 23.) Based on my review of the record, I find that substantial evidence exists to support this finding.

In July 2011, Dr. Macdonald reported that Browning's memory was intact for past and recent details; his fund of information was normal; and he had an appropriate affect. (R. at 450.) In 2011 and 2012, Dr. Gilliam's physical examinations were normal except for positive straight leg raising tests and tenderness to palpation. (R. at 478, 483, 488, 493, 548, 552, 554, 561, 565, 571, 577, 580, 583.) He found that Browning had no impairment in recent or remote memory; he had a normal attention span and ability to concentrate; and an

appropriate fund of knowledge. (R. at 567.) His mood was stable, and he was not angry, anxious or depressed. (R. at 548, 552, 554, 561, 564, 570, 577, 580, 582.) Dr. Ehtesham repeatedly found that Browning exhibited no attention-related symptoms; his thought process was goal-oriented; he reported no delusions or hallucinations; he had fair insight; and intact judgment. (R. at 501, 503, 506, 678, 681, 683, 685.) In March 2012, Swinney noted that Browning had no impairment of recent or remote memory; he had a normal attention span and ability to concentrate; and his fund of knowledge was appropriate. (R. at 515.) In July 2012, Browning reported that he had fairly good pain control with his medications. (R. at 541.) In July and September 2012, Browning reported that Klonopin was helping his symptoms of anxiety. (R. at 540-41.) In October 2013, Browning reported that his medications helped with his pain and anxiety symptoms. (R. at 692-93.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986).

In addition, Dr. Jadali reported that Browning did not have paravertebral muscle spasms; he had no tenderness or kyphosis along the vertebral column; no swelling, deformity, tenderness, redness or crepitus in the joints; no instability to stress testing, erythema, warmth or effusion in his shoulder, elbow, wrist, knee or ankle; and anterior and posterior drawer tests were negative. (R. at 695-96.) Browning was alert and oriented; he could hear and comprehend normal conversational speech; his speech was fluent and comprehendible; his mood and affect were normal; and his thought process was logical. (R. at 694.)

Browning argues that the ALJ, in arriving at her residual functional capacity finding, should have given more weight to his treating physicians' opinions. I find this argument unpersuasive. Under the regulations, a treating source opinion is

entitled to less than controlling weight if it is not supported by medical signs and laboratory findings and is inconsistent with the record as a whole. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c) (2015).

The ALJ noted that she was giving no weight to the opinions of Dr. Gilliam, Dr. Ehtesham and Dr. Kanwal because they were inconsistent with their own treatment notes and the other evidence of record. (R. at 18, 20, 25.) Dr. Ehtesham's progress notes repeatedly reflect findings that Browning exhibited no attention-related symptoms, his thought process was goal-oriented, and he reported no delusions or hallucinations. (R. at 678, 681, 683, 685.) These findings contradict Dr. Ehtesham's opinion that Browning had no useful ability to maintain attention or concentration. (R. at 688.) Dr. Ehtesham's reasoning behind this finding was that Browning had "prob[lems] [with] memory," but she failed to provide insight into the contradiction between this finding and her treatment notes. (R. at 689.) *See McGlothlen v. Astrue*, 2012 WL 3647411, at *6 (E.D. N.C. Aug. 23, 2012) ("form reports like the questionnaire completed by Dr. Serano are arguably entitled to little weight due to the lack of explanation"). The ALJ stated that she was giving greater weight to the opinion of Jones and Whitehead, who opined that Browning did not have significant difficulty with attention or concentration, and also that he exaggerated his symptoms. (R. at 22, 663.)

The ALJ also gave little weight to Lanthorn's findings, except for his finding that Browning had a good ability to understand, remember and carry out simple instructions. (R. at 25, 527.) Lanthorn opined that Browning had no useful ability to function in the majority of areas assessed. (R. at 526-27.) Lanthorn identified Browning's allegations, including his statement that his concentration was poor. (R. at 533.) The Fourth Circuit has observed that a physician's transcription of a

claimant's subjective complaints does not "transform[] his observations into 'clinical evidence.'" *Craig v. Chater*, 76 F.3d 585, 590 n.2 (4th Cir. 1996) ("If this were true, it would completely vitiate any notion of objective clinical medical evidence.").

While the ALJ noted that, on testing by Lanthorn, Browning obtained a full-scale IQ score of 59, (R. at 534-35), she found that Browning's work history, education and the progress notes of treating providers, especially Dr. Ethesham, as well as the reports of Whitehead and Jones, do not suggest mild mental retardation or mental symptoms at the level of severity suggested by Lanthorn. (R. at 20.) Browning obtained his GED, and he has performed semi-skilled work. (R. at 64, 66, 95-96, 280.)

The ALJ also gave no weight to Dr. Gilliam's December 17, 2012, assessment. (R. at 18, 24.) The ALJ noted that on the day Dr. Gilliam completed the opinion form, Dr. Gilliam reported good symptom control; normal chest, lung and cardiovascular findings; 5/5 extremity strength; intact sensation; normal reflexes; and unremarkable psychiatric testing. (R. at 546-48.) Dr. Gilliam also repeated these same findings at Browning's next examination nearly two months later. (R. at 542-44.) In addition, the ALJ gave no weight to the opinion of Dr. Kanwal, as his findings were inconsistent with the longitudinal record. (R. at 25.) Dr. Kanwal found that Browning could occasionally lift items weighing no more than five pounds, with no ability to do frequent lifting of any kind. (R. at 597.) Even Dr. Gilliam opined that Browning could occasionally lift and carry items weighing up to 20 pounds and frequently lift and carry items weighing up to 10 pounds. (R. at 672.) Dr. Kanwal's explanations for his opinion were references to

symptoms of chronic pain and a diagnosis of disc disease with radiculopathy. (R. at 597.)

Based on the above, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and her finding on Browning's residual functional capacity.

Browning next argues that the ALJ erred by failing to issue subpoenas to have certain consultative evaluators present at his hearing for cross-examination. (Plaintiff's Brief at 5-6.) On November 7 and 8, 2013, counsel for Browning requested that consultative examiners Jones, Whitehead and Dr. Jadali be subpoenaed to appear at the hearing. (R. at 327-28.) In making this request, however, Browning's counsel failed to comply with the regulatory mandate that he "state the important facts that the witness or document is expected to prove; and indicate why these facts could not be proven without issuing a subpoena." (R. at 327-28.) 20 C.F.R. §§ 404.950(d)(2), 416.1450(d)(2) (2015). At the hearing, Browning's attorney explained that he wished to subpoena Jones and Whitehead in an attempt to have them explain how Browning was uncooperative during intelligence testing and to explain how they determined that he was "sophisticated in vocabulary," but ranked in the low range of intelligence. (R. at 91.) Browning's attorney also explained that he wished to subpoena Dr. Jadali to ask him what diagnostic testing was the basis for his assessment. (R. at 93.) The ALJ denied these requests. (R. at 12, 332.) In fact, in response to the ALJ's denial of the requested subpoenas, counsel stated at Browning's hearing that, "We're accepting that – that answer, but I just wanted to provide an explanation to the Court…." (R. at 94.)

There is no indication that Browning's counsel requested that the record be held open to allow him to produce any further evidence from these consultative evaluators. Based on these facts, I do not find that the ALJ's refusal to issue these subpoenas was an abuse of discretion. *See King v. Astrue*, 2011 WL 5080159, at *19 (E.D. Va. Oct. 24, 2011). The regulations provide that an ALJ may, on his or her own initiative or on request of a party, subpoena a witness "[w]hen it is reasonably necessary for the full presentation of a case." *Tyree v. Bowen*, 1988 WL 16918, at *1 (4th Cir. Feb. 26, 1988) (citing 20 C.F.R. §§ 404.950(d), 416.1450(d)); *see also Butera v. Apfel*, 173 F.3d 1049, 1057 (7th Cir. 1999) ("Cross-examination is thus not an absolute right in administrative cases.").

Browning cites *Goan v. Shalala*, 853 F. Supp. 218 (S.D. W.Va. 1994), in support of his argument. In *Goan*, the claimant sought to subpoena a physician who had drafted a report *after* the administrative hearing. *See* 853 F. Supp. 219. It is noted that, the consultative examinations at issue in this case were performed on October 18, 2013, nearly one month *prior* to Browning's hearing. (R. at 661-66, 692-97.) Browning contends that there was insufficient time to submit and receive responses on interrogatories posed to the evaluators to question their findings. (Plaintiff's Brief at 6.) The ALJ allowed Browning a fair and meaningful opportunity to present his case and had no indication that the reports of Jones, Whitehead and Dr. Jadali were inaccurate or biased or that subpoenaing the drafters would have added anything of value to the proceedings. While the ALJ gave greater weight to the opinions of Jones, Whitehead and Dr. Jadali, as indicated above, there is sufficient evidence in the record to support the ALJ's weighing of the medical evidence.

Based on the above reasoning, I find that substantial evidence exists to support the ALJ's conclusion that Browning was not disabled and not entitled to benefits. An appropriate Order and Judgment will be entered.

DATED:     September 19, 2016.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE